Lee Roy **FERRELL**, II, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 83–87C.

United States Claims Court.

July 24, 1991.

Chuck R. Pardue, Augusta, Ga., for plaintiff.

John S. Groat, with whom were Asst. Attys. Gen. Stuart M. Gerson, David M. Cohen and Thomas W. Petersen, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

This case comes before the court on defendant's motion to dismiss,[1] or, in the alternative, for summary judgment, and plaintiff's Dispositive Motion to Direct United States Air Force to Award a Military Disability Retirement to Plaintiff. Plaintiff brings this action under 10 U.S.C. § 1201 (1988), which provides permanently disabled service members with disability retirement pay if their condition meets certain criteria. He requests that his military records be corrected to reflect a medical discharge retroactive to March 1984. The court concludes for the following reasons that certain deviations by the Air Force from standard military procedure constituted prejudicial error, and that the determination by the Physical Evaluation Board that plaintiff was fit for service at the time of his discharge was arbitrary, capricious,

---

1. The Government initially argued that plaintiff's claim for disability benefits under 10 U.S.C. § 1201 (1988) is not based on a money mandating statute and should therefore be dismissed for lack of jurisdiction. However, the recent Federal Circuit decision of *Sawyer v. United States,* 930 F.2d 1577 (Fed.Cir.1991), decided this issue unfavorably to the Government.

and unsupported by substantial evidence. Accordingly, plaintiff's motion, which will be treated as one for summary judgment, is granted to the extent set out herein.

## BACKGROUND

### a. Factual Background

Plaintiff has been on active duty twice, attaining the rank of Staff Sergeant. The first period was from September 12, 1972 through September 13, 1976. During that enlistment he suffered a back injury in a diving accident. At that time he was treated for bilateral low back pain which occasionally radiated down his left leg to his thigh. Plaintiff does not claim that he was disabled when that first enlistment ended, and the court notes that sometime between December 11, 1977 and July 28, 1980, plaintiff's private physician, Dr. Robert H. Swint, reported merely that plaintiff "has had some slight problem with low back pain when he does any heavy lifting." Prior to his second enlistment, plaintiff had an Air Force physical in July 1980 during which he reported recurrent back pain.

Plaintiff re-enlisted on November 10, 1980 and remained on active duty as a security officer through March 26, 1984, when he received an honorable discharge prompted by a voluntary request for discharge. During this second enlistment his back condition may have been aggravated on January 20, 1981 by a mobility exercise in which he had to wear a 130–pound pack. He also re-injured his back in late November 1983 while studying Judo at the YMCA. He received a CAT SCAN on December 15, 1983 in conjunction with subsequent complaints of lower back pain, which showed him to be suffering from a herniated disk (nucleus pulposa) L4–5. On January 4, 1984, Ferrell received a 4T classification which means temporarily unfit for world-wide duty. Plaintiff was told to avoid bending or lifting more than 20 pounds.[2] Medical records reflect that a myelogram on January 6, 1984 showed a "large Extradural defect at L4–5 centrally.... Bulging disks are present at L1–2, L2–3 and L3–4." Plaintiff was recommended for surgery.

Plaintiff requested a voluntary separation from duty on January 5, 1984. He had joined the Air Force in order to become a Commissioned Officer, but requested separation when he was found to be medically unqualified for commissioning into the Officer Training School.

Plaintiff received a report dated January 20, 1984, reflecting approval of an honorable discharge. The report states that a "termination occupational physical [is] required." When plaintiff reported to have his physical, however, he was told that a separation occupational physical could not be performed on a service member with a 4T profile.

A note on Ferrell's medical records by Air Force doctor Rebecca Sletten dated January 19, 1984 recites, "Initiate a medical hold for disch[arge]." Another note dated January 25, 1984 states, "will start medical hold pending official word from Dr. Schmelka." The next day Dr. Sletten recites, "will do surgery and put [patient] on terminal leave—no need for medical hold unless complications [from] surgery."

On February 1, 1984 plaintiff underwent a laminotomy, foraminotomy, and diskectomy by Dr. Daniel Schmelka, a neurosurgeon practicing at the Air Force hospital on Grand Forks Air Force Base ("Grand Forks AFB"). Although the medical reports indicate that the myelogram was "positive for two herniated disks," only disk L4–5 was removed. After surgery, Ferrell was given an L–4T and X–4T profile.[3]

**2.** There is in the record a revised profile report which reflects a permanent L4 profile. This was apparently a mistake. That report should have been a temporary L4 profile, as confirmed by the fact that it was to expire automatically on February 1, 1984.

**3.** The L factor refers to the functional use of the lower extremities. The X factor refers to the physical ability to perform required duties involving lifting. As to both these categories, a "4" identifies "questionably qualified members ... which will inform the personnel system of the member's unavailability for assignment and other personnel actions, and be referred to an MEB [Medical Evaluation Board]." AFR 160–43 3–1(d). The T factor denotes that the profile

Plaintiff claims in his affidavit of February 12, 1987 to have requested that a Medical Hold be put on his voluntary discharge proceedings in light of his medical condition:

> I advised Separations that I had encountered some medical problems. TSgt Baird said I needed to request a Medical Hold. I asked what would happen if that was refused. He said, "then they have to give you a Medical Board." I advised Dr. Sletten and she initiated procedures for the Medical Hold.
>
> . . . .
>
> In the meantime, my Medical Hold had been refused by Randolph Air Force Base, Texas.

Dr. Schmelka saw plaintiff on February 21, 1984 for a post-operative evaluation. He reported that Ferrell had done well after surgery, that the surgical wound was healed, and that there was no leg pain or back pain. He gave plaintiff instructions on how to live with his problem, and advised him not to seek heavy labor. Plaintiff then went to Albany, Georgia, pending completion of the voluntary discharge process he had initiated on January 5, 1984. He was seen there on March 7, 1984 by Dr. M.M. Luedbert at the United States Air Force Hospital, Moody Air Force Base, with complaints of pain, and was found to have suffered pain in the right leg and paravertebral (back) spasms since February 27, 1984. Two days later, Dr. John A. Torrent diagnosed plaintiff as having a lumbar strain, and treated him with an anti-inflammatory drug and a pain-muscle relaxant combination.

Plaintiff's voluntary honorable discharge was processed to completion on March 26, 1984, shortly after his back surgery, as noted above. Plaintiff was discharged without the benefit of an occupation separation physical or a medical board.

Plaintiff also had stress-related complaints. During his second enlistment he was seen several times at the Mental Health Clinic on Grand Forks AFB. He was evaluated for anxiety and depression in the Grand Forks AFB Family Practice Clinic on January 10, 1983. Plaintiff was also treated during both enlistments for conjunctivitis and keratitis, two diseases of the eye, and for severe headaches.

After continuing back pain and other medical and psychological problems, plaintiff was examined in a Veterans Administration ("VA") facility. On November 29, 1984, he was assigned a 50 percent disability rating by the V.A, consisting of a 40 percent disability based on his "spinal disc condition," and 10 percent based on keratitis. Payments were retroactive to an effective date of April 1, 1984. This was to replace a zero percent disability rating assigned by the VA in July 1984, apparently the result of a computer error which incorrectly classified plaintiff's condition. A 40 percent rating indicates that the VA found plaintiff's disk condition severe, with recurring attacks and little intermittent relief. 38 C.F.R. § 4.71a, diagnostic code 5293 (1984).

Dr. Graham Coates, M.D., a psychiatrist and plaintiff's brother-in-law, met with plaintiff several times prior and subsequent to his discharge. Dr. Coates determined on May 20, 1984 that plaintiff has suffered severe back pain since his discharge, and shows definite impairment in relating to people and in productivity. He later submitted an alternative report on February 17, 1987 stating that plaintiff's difficulty in functioning continues to be aggravated by his degenerative disk disease, and that his schizoid personality is aggravated by the stress of anxiety about his disability and "life situation."

b. Procedural Background

Ferrell applied to the Air Force Board for Correction of Military Records ("AFBCMR") on September 7, 1984 requesting military disability retirement benefits and that his records be corrected to reflect a medical discharge based on his back problems, depression, keratitis, and migraine headaches. The AFBCMR denied his application for relief on November 12, 1985, relying in part on plaintiff's errone-

is temporary and is given to allow time for healing.

ous zero percent VA disability rating, which was corrected two weeks later. Plaintiff filed suit in this court on April 20, 1987. At defendant's request and with plaintiff's concurrence, the case was remanded to the AFBCMR on April 22, 1987, which again denied compensation on August 1, 1988 despite plaintiff's VA disability rating. This AFBCMR confirmed plaintiff's claim that he requested a physical exam.

On appeal of the second board denial and with agreement of the parties, the court remanded the case a second time in order to have plaintiff's case reviewed by a medical board, which consists of both an Medical Evaluation Board ("MEB") and a Physical Evaluation Board ("PEB"). AFR 35–4 § 2–1. The MEB makes medical evaluations only. It does not make determinations as to a service member's fitness for duty. "The purpose of the MEB is to identify and detail the character and extent of medical impairment. The purpose of the subsequent Line of the Air Force boards and councils is to determine fitness for duty...." AFR 160–43 § 3–2(b)(1). There is normally an informal PEB convened prior to submission of the MEB recommendation to the formal PEB. AFR 35–4 §§ 3–9 through 3–29. The decision of the formal PEB can then be reviewed by the Physical Review Council ("PRC"), and an Air Force Personnel Board ("AFPB").

The MEB was convened on September 15, 1989. It was instructed to determine the extent of plaintiff's present medical condition and also, as best as could be determined, his condition at the time of his discharge on March 26, 1984. The MEB found that plaintiff's chronic back and left leg pain were incurred while he was entitled to basic pay, and that his psychiatric determination under DSM III–R 316.00 (which gave him a definite impairment for social and industrial adaptability) was also incurred while he was entitled to basic pay. He was in no apparent distress, and his general physical examination was unremarkable. The MEB reflects that Ferrell was able to bend forward and bring his fingers to within approximately four inches of the floor without any discomfort, some-

thing which plaintiff contests. The MEB acknowledged some conflict in Dr. Schmelka's report that plaintiff achieved good pain relief and plaintiff's subsequent visits with other physicians for recurring pain.

The MEB evaluated Ferrell with respect to five complained of ailments: chronic back pain, psychological factors, generalized anxiety disorder, migraine headaches, and keratitis. It concluded that the psychological problems and headaches were not incurred or aggravated while on active duty. The other three conditions were. The apparent cause of his back pain was bulging disks at L4–5 and at L5–S1. The eye disease was found to be inactive. The psychological problems were found to affect physical condition and to impair social and industrial ability.

The MEB concluded that plaintiff had chronic back and leg pain, a history of keratitis, though no active disease, migraine headaches, and generalized anxiety and psychological factors. It also concluded that he would have automatically received a P4T and an L4T profile for approximately three months if he had been evaluated at the time of separation from service, which occurred approximately six weeks after the surgery; apparently to give time to assess recovery. This would have made Ferrell unfit for worldwide assignment. The Board stated that the "main limiting factor appears to be his current S4 profile, which according to Psychiatry would indicate a marked military impairment and a moderate social and industrial impairment." It summarized by recommending that Ferrell be found not worldwide qualified, and not retained.

In this case, no informal PEB was held. The MEB was instead followed immediately by the formal PEB. After considering plaintiff's file and giving him an opportunity to testify, the board found on September 27, 1989, that, at the time of his separation from service in 1984, plaintiff was fit for duty. The formal PEB consequently denied plaintiff's request for relief. This decision was announced immediately following the hearing. No explanation was given. This constitutes the Air Force's final

decision, *Pope v. United States*, 15 Cl.Ct. 218, 223–24 (1988), and it is this decision which comes before the court for review on plaintiff's appeal.

The formal PEB decision was reviewed by the PRC on December 12, 1989, and by the AFPB on January 19, 1990, and was approved by both. The PRC decision was accompanied by a one-page explanation. It recites that Ferrell's last performance report did not reflect any duty problems, and that he was released in March after surgery which had produced "good results." It found that Ferrell "did not overcome the presumption of fitness, as defined in AFR 35–4, 3–33.c," as regards back problems. It thus agreed with the formal PEB, and disagreed with the MEB.

The PRC refers to consultation with "Informal PEB members after their review, which was accomplished without reference to Formal PEB proceedings." Since there is a subsequent affirmance of the "Formal PEB (and Informal PEB's consultative opinions)," apparently there was a reference to an Informal PEB without notice to Ferrell.

The AFPB affirmed the Formal PEB as well. In a two-page letter, the board reviewed plaintiff's case and discounted both the back problems and other complaints. As to the back, the board recites that Ferrell did well after surgery, and "there was no leg or back pain." As to the VA rating, the board erroneously asserts that Ferrell's change from a zero percent to a 40 percent with respect to his back was due to a subsequent hospitalization in August 1984.

Plaintiff argues that defendant denied him valuable administrative rights by not putting him on medical hold after surgery in order to conduct an occupational physical and a MEB review, as well as by not convening an informal PEB prior to the formal PEB. He further argues that the decision to not to correct his records to reflect a disability retirement was arbitrary, capricious, and unsupported by substantial evidence. He therefore asks the court to correct his discharge records to reflect (i) a 40 percent disability retirement for his intervertebral disk syndrome under the VA Schedule for Rating Disabilities, 38 C.F.R. § 4.71a, diagnostic code 5293 (1984), and (ii) a 30 percent disability rating for his depression under the VA Schedule for Rating Disabilities, 38 C.F.R. § 4.71a, diagnostic code 9210, which would amount to a 60 percent combined rating.

## DISCUSSION

■ Military board decisions come before the court subject to a narrow standard of review. Plaintiff must establish by cogent and convincing evidence that the decision "was arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed.Cir.), *cert. denied*, 479 U.S. 853, 107 S.Ct. 188, 93 L.Ed.2d 121 (1986); *accord Finn v. United States*, 212 Ct.Cl. 353, 356, 548 F.2d 340, 342 (1977) (quoting *Stephens v. United States*, 174 Ct.Cl. 365, 372, 358 F.2d 951, 954 (1966); *O'Neil v. United States*, 6 Cl.Ct. 317, 319 (1984). This limited standard of review is reflected in the long-standing view that "responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province ... courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir.1983) (footnotes omitted).

A service member is not eligible for military disability compensation unless that service member is determined to be unfit to perform his or her military duties while entitled to basic pay. AFR 35–4 § 3–33(c). "Members are unfit when they are clearly unable to perform the duties of their office and grade in such a manner as to reasonably fulfill the purpose of their employment on active duty." *Id.* Moreover, physical defects incurred prior to enlistment cannot be used as grounds for unfitness, AFR 35–4 § 3–33(f), unless the defect or condition was aggravated by military service. AFR 35–4 § 3–37(f).

■ Defendant in this action also enjoys a "strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties

correctly, lawfully, and in good faith." *Sanders v. United States,* 219 Ct.Cl. 285, 302, 594 F.2d 804, 813 (1979). "[I]t is not the province of this court to factually determine, *ab initio,* whether plaintiff was unfit for military service at the time of his release." *Dzialo v. United States,* 5 Cl.Ct. 554, 561 (1984). The court will review the formal PEB's decision in light of the foregoing standard.

 Defendant's failure to provide plaintiff with the benefit of an informal PEB [4] certainly represents a deviation from standard military procedure, but is not in itself prejudicial unless it can be shown that the purpose behind the informal PEB went unfulfilled.[5] The informal PEB reviews the case records only, sends its findings and recommended disposition to the service member, and counsels him or her as to rights, options, required actions, and the time limit for agreement or disagreement with its decision. AFR 35–4 § 3–9. However, the informal PEB is not a prerequisite to the formal PEB. The latter's scope of review is broader, and it has full authority to act on a case. As counsel for plaintiff points out, the real value of an informal PEB is that the service member learns how the Air Force views his or her case. In the event of an adverse decision by the informal PEB, the service member may request a formal PEB. The formal PEB includes a formal hearing, during which the service member may respond to the Air Force's rationale.

 The court does not view the absence of an informal PEB to be prejudicial. Plaintiff's request for disability had been evaluated twice by the AFBCMR before the formal PEB convened. The AFBCMR's written decisions served to inform plaintiff of his fitness for duty in the eyes of the Air Force, and gave him the opportunity and the time to formulate a line of reasoning for presentation to the formal PEB as to why his evaluation should be otherwise.[6]

Much more troubling to the court are the deviations from standard military procedure at the time of plaintiff's discharge. It appears from the evidence that plaintiff's request for a Mandatory Occupation Separation Physical was denied because the Air Force is not allowed to perform this physical on persons having a 4T profile, which plaintiff had. The reason for this is found in the purpose of the 4T profile, which is to enable the military to retain the service member for further medical observation and treatment up to one year after a defect becomes disqualifying. AFR 160–43 § 3–2(d). However, plaintiff was not afforded the further medical observation and treatment implicit in a 4T profile until more than five years later and at the order of this court.

The first AFBCMR decision of November 12, 1985 was inconsistent in its reasoning as to why there was no separation physical or MEB despite plaintiff's 4T profile. It

---

4. The parties agree, the PRC's comments notwithstanding, that no informal PEB was conducted. If one was convened, it was apparently not in contact with plaintiff.

5. Absent a showing of prejudice, a procedural deviation constitutes a harmless error and is not grounds for disturbing the Air Force's administrative ruling. *See Gardner v. TEC Sys., Inc.,* 725 F.2d 1338, 1345 (Fed.Cir.) (en banc) (reviewing courts shall disregard harmless errors which do not affect the parties' substantive rights), *cert. denied,* 469 U.S. 830, 105 S.Ct. 116, 83 L.Ed.2d 60 (1984).

6. The AFBCMR has the power to evaluate a service member's entitlement to disability benefits and acts on behalf of the Secretary just as the PEB does. *Sawyer v. United States,* 930 F.2d 1577, 1581–82 (Fed.Cir.1991). "There is suffi-

cient flexibility in the system to permit the [AFBCMR and the PEB] to complement or supplement one another in the interest of reaching a just result." *Id.* at 1582. The AFBCMR is not restricted to act only in an appellate capacity, but may also make findings of fact, since "[t]he regulations defining its activity make no distinction between cases in which the review boards have previously acted and those in which the [AFBCMR] is the first body to consider the claim." *Id.* at 1581; *see* 32 C.F.R. §§ 723.-6(a)(3), 723.6(c) (1983). Because "[t]he court is unaware of cases specifically addressing the legal differences between a formal and an informal PEB decision[,]" *Pope v. United States,* 15 Cl.Ct. at 224, any procedural defect which may have accrued in the absence of an informal PEB is deemed to have been cured by the two AFBCMR recommendations which preceded the formal PEB decision.

first claimed that plaintiff waived his right to a separation physical by signing his voluntary discharge papers. It then provided a very different reason:

[T]he "T" denotes that this is a temporary [profile and is given to allow time for healing].... A factor of X–4T does not mandate a separation or retirement physical examination.

... In the instant case, applicant was not determined by competent military medical authority to be physically disqualified for continued duty, but was convalesing [sic] from surgery. Without a questionable unfitness determination, a MEB was not convened. Since there was no MEB, no official determination could be made concerning his qualification for duty or whether or not referral to a PEB was appropriate.

To say that Ferrell was not determined to be physically disqualified is somewhat disingenuous on two counts. First, because at the time of his discharge he had a 4T status, which indicates he was at least temporarily disqualified for worldwide service. This rating was not fabricated of whole cloth. In January 1984, Dr. Schmelka recommended surgery based on the following analysis:

[Ferrell] has been plagued with repeated episodes of exacerbating back pain with left leg pain. He has had physiotherapy and contrasts and has improved sufficiently to where they would limit his activities in the forces but he would be allowed to carry a 130 pound training pack. It is important to note that this individual is of the martial arts and has a mental capacity to overcome a lot of pain. He states that ... he has been plagued with a constant backache which exacerbates from time to time with radiation of pain into his left leg.

As the PRC noted, the episode beginning in November 1983 was the third time Ferrell had been treated for back problems in the Air Force. It is not entirely straightforward, therefore, to suggest that all was well prior to Ferrell's surgery. While there may have been no permanent disability at that point, presumably Dr. Schmelka felt the problems were serious enough and verifiable enough to warrant surgery. At a minimum, it is undeniable that there was a temporary disability prior to his discharge.

The second is that the very reason a determination of fitness was not made was because of the failure to put Ferrell's discharge on medical hold. The Government thus confronts plaintiff with a "catch 22." Ferrell has not shown himself to be disabled during service, and yet he was not given the opportunity to prove he was disabled through an MEB or a separation occupational physical because his voluntary resignation was processed, in the face of his request for a hold, and in the face of regulations which strongly counsel a hold in such circumstances.

The regulations applicable in 1984 provide that "MEB evaluation is mandatory" if the serviceman has a herniated disk, or history of surgery for that condition. AFR 168–4 § 13–5 (By reference to AFR 160–43, Chapter 5). AFR 160–43 § 3–2(d), in turn, permits use of a 4T profile for up to one year after the defect becomes disqualifying to allow for further medical treatment and evaluation. A medical hold is a device to retain the member beyond an established separation date to permit disability evaluation. AFR 160–43 § 3–2(f).

Plainly what should have happened to Ferrell is that his voluntary discharge should have been put on medical hold to allow an MEB to determine if the 4T profile could be lifted and plaintiff put back to work. Failure to provide an MEB was inconsistent with AFR 168–4 § 13–5. The second board decision also concedes that failure to conduct a discharge physical was "a violation of Air Force policy." Instead, an MEB and PEB were convened five years later in an effort to determine Ferrell's condition in 1984.

The Air Force's regulations highlight the necessity to evaluate potential disability retirees prior to discharge:

d. Prompt Identification. Prompt identification and timely referral for disability processing, of those members whose physical qualifications for contin-

ued military service is in doubt, is essential.

....

(3) Retention of questionably qualified members until near their established separation or retirement date imposes a presumption of fitness that may be impossible to overcome. This may result in their being denied disability benefits under public law....

AFR 160–43 § 3–1(d)(3). This regulation could have been written for the present circumstance. Based on an anemic record, the Air Force retreats into a presumption of fitness, and a presumption of correctness of the PEB's unexplained finding. Yet it is the agency's own procedural errors which put plaintiff into a position of having to overcome this presumption. That the failure to convene an MEB after a period of convalescence was prejudicial is in fact conceded by the first AFBCMR report: "Since there was no MEB, no official determination could be made concerning his qualification for duty or whether or not referral to a PEB was appropriate."

Nevertheless, the court cannot reverse the decision of the PEB merely on the possibility that it would have found plaintiff unfit if it had acted prior to discharge. There would be no prejudice resulting from the procedural error if in fact plaintiff was not unfit after surgery. The only effect which the court draws from the failures to put Ferrell on medical hold, the lack of an occupational physical, and the lack of an MEB is that the PEB decision cannot rest on the fact that plaintiff's last performance appraisal (apparently in June 1983) showed no impact on work performance. In other words, the fact that Ferrell's performance was not impaired to the point of permanent unfitness prior to surgery is not conclusive of whether he was unfit during what should have been a postoperative period of three months to a year of convalescence. To that extent, the apparently conclusive reliance by the PRC and the AFPB on the absence of unfitness reports was erroneous. Ferrell was never tested because he

was discharged immediately, without a Medical Review Board or an occupational physical.

The PEB decision, which is the theoretical focus of the court's review, does not, unfortunately, lend itself to a review of the substance of the matters at issue.[7] No explanation is given for the refusal to change plaintiff's status. It is therefore not inappropriate or unfair for the court to look to the analysis of the correction boards or of the PRC and AFPB. The PEB was in effect affirming the former and affirmed by the latter. Thus the court assumes, as it must, that the PEB decision was based, at least in part, on the inappropriate and misleading consideration given to the satisfactory performance appraisals.

The 1985 AFBCMR decision was also based on a recommendation from the Medical Standards Division which recites, correctly, that "[t]he records unfortunately are incomplete and do not contain a copy of the discharge correspondence or the applicant's discharge physical." It goes on, however, to state that "We do know, however, that the applicant received a complete physical as a part of his hospitalization in February." The basis of this assertion is not disclosed. The statement is somewhat confusing, in that the hospitalization commenced in January, and Ferrell did receive an examination in connection with the decision to go forward with surgery. The court is unable, however, to discover any evidence of a "complete physical," most particularly, not one after surgery.

That recommendation also recites that the review of medical records "does not disclose any evidence to support correction of records from voluntary discharge to a medical discharge. Evidence of record indicates the applicant was fit and medically qualified for continued military service, retention or appropriate separation." Beside being superficial, these statements are inaccurate, if for no other reason than that they make no effort to take account of the

---

7. Nor is the defendant's brief helpful in that regard. It is addressed solely to the jurisdictional argument and to the presumption of correctness which PEB decisions enjoy. There is no discussion of or citation to record evidence.

4T profile, and the instructions not to bend or lift objects over 20 pounds. They do not account for the VA corrected rating. Nor do they address Dr. Coates' findings.

The Medical Standards Division recommendation prior to the 1987 board decision makes a similar statement concerning the discharge examination: the "hospital work-ups in December 1983 and February 1984 included thorough physical examinations which were far more extensive than either a routine physical examination or the very limited examination given when an occupational physical is done." There is no record support for that statement. Moreover, to the extent that plaintiff was examined carefully before the surgery, that statement is not directly relevant. Consideration prior to surgery could not possibly be a meaningful substitution for an occupational physical after surgery. The question should be, what was plaintiff's condition in light of the surgery?

As to the touted physical examination after surgery, the record reflects none. Dr. Schmelka's notes of surgery on February 1 are in the record at III–56, as well as a note dated February 8 which reflects that "patient did well postoperatively. His sutures were removed. He is being discharged from the service. He is to see me in two weeks." The notes of that subsequent visit state in full the following: "The patient had his surgery and has done well. He has no leg pain or back pain. Wound is healed. He is leaving the Air Force this Saturday and will be followed up in Georgia. He was given a book with instructions on how to live with his problem. I suggested to him that he not seek heavy labor work." There is certainly no reason to assume that "seeing" a patient on a post-operative office visit constitutes a "thorough physical examination." The finding in the reports to the AFBCMR which state that a physical was performed in connection with discharge are therefore not based on substantial evidence.

Moreover, the comment that there was no leg or back pain would not have been accurate after March 7, 1984, when plaintiff was on sick call at Moody Air Force Base in Albany, Georgia. That report, and numerous other subsequent examinations, reflects spasms and pain, as well as medication for pain.

■ The record contains substantial evidence that Ferrell was in fact partially disabled. Much of this evidence is post release. It is not inappropriate to consider this evidence, particularly when the examination at the time of release was perfunctory. *Powers v. United States,* 176 Ct.Cl. 388, 400 (1966). It is particularly relevant here, however, since Ferrell was discharged prematurely. This evidence was either not discussed by the various boards, or dealt with incorrectly. It is noteworthy, in this regard, that the only objective medical evaluation performed by the Air Force which is of record, that of the MEB in 1989, resulted in a recommendation that Ferrell be found unfit. While the question of fitness is indeed not merely a medical one, the PEB's decision to ignore, without any explanation, the MEB findings, generates very little gravitas. It is even more suspect, given the inaccuracy and misdirection of the previous AFBCMR decisions, and the virtual absence of any medical evidence that, after surgery, Ferrell was fully fit.

■ As mentioned above, the AFPB misconstrued the reason for the VA decision to change the rating from zero percent to 40 percent. Plaintiff's VA ratings, while not determinative on the issue of his fitness for duty at the time of discharge or of his eligibility for disability pay, *Hinkle v. United States,* 229 Ct.Cl. 801, 804–05 (1982); *Dzialo v. United States,* 5 Cl.Ct. at 565; *see De Cicco v. United States,* 230 Ct.Cl. 224, 231, 677 F.2d 66, 71 (1982), are nevertheless entitled to great weight in these regards when based on a medical examination, as was the case here. *Beckham v. United States,* 183 Ct.Cl. 628, 634–35, 392 F.2d 619, 621–22 (1968); *Dayley v. United States,* 180 Ct.Cl. 1136, 1143 (1967); *Cooper v. United States,* 178 Ct.Cl. 277, 289 (1967); *Smith v. United States,* 168 Ct.Cl. 545, 553 (1964). The VA evaluated plaintiff shortly after discharge and awarded his rating retroactive to April 1, 1984, or seven days after discharge. The 40 per-

cent VA disability rating for chronic back pain is therefore strong evidence of unfitness.[8]

The record includes two letters from companies which rejected plaintiff because of his back problems. One, a management training position, would have required too much standing. The other, a drafting position, would have required more mobility and lifting capacity.

The court notes further that, in its 1987 recommendation to deny disability discharge status, the Medical Standards Division of the AFBCMR conceded that he was not suited for heavy labor, and that "it was plainly recognized that the applicant had other degenerative changes in his lumbosacral spine and was at increased risk for future low back problems."

Dr. Coates informed the record that Ferrell continues to be symptomatic for degenerative disk disease, including cervical, lumbar, and sacral pain. Ferrell is taking analgesics and sedatives. It was Coates' opinion in 1985 that Ferrell was incapable of maintaining gainful employment, primarily due to disk disease.

■ The court concludes that, with respect to disk disease, the failure to grant plaintiff a retirement based on a partial disability was erroneous because of procedural errors, because it was arbitrary, and because it was not based on substantial evidence.

*Other medical complaints*

■ Plaintiff also seeks a 30 percent disability rating with respect to depression. Together with the 40 percent back disability, this would yield a 60 percent disability. Three of the five areas of diagnosis discussed by the MEB relate to complaints other than keratitis or disk disease. The first was "Psychological Factors Affecting Physical Condition." This was found to be a chronic condition, affecting definite social and industrial ability. It was found not to pre-exist military service, and to have been

incurred during service. Plaintiff points out that a definite impairment of social and industrial adaptability carries with it a 30 percent disability rating. The MEB report discounts its own finding, however, by stating that "there were separate records kept in the Mental Health clinic which were not available to us for review. It is possible that a portion of his psychiatric profile, particularly the psychological factors [ ] affecting his physical condition may have been compounded over the years since his separation." A "Generalized Anxiety Disorder" was found to have been acquired while not on active duty. The final category was for migraine and tension headaches, found to predate military service, based on record review.

Several factors make plaintiff's depression dissimilar to his back problems. As noted above, the MEB findings are considerably more equivocal with respect to psychological problems. The VA rating of 50 percent disability was based on keratitis and disk disease, not on depression. There is one notation that Ferrell was seen in the family practice clinic for depression on January 10, 1983, but there is no suggestion that this condition was disabling, or contributed to his temporary disability profile. Dr. Coates writes that Ferrell's problems with his back aggravated a "schizoid personality." There is no record proof that that personality disorder was incurred during service, or that it was disabling. Accordingly, the PEB's refusal to grant a disability discharge based on depression was not arbitrary, and was based on substantial evidence.

CONCLUSION

Plaintiff's dispositive motion is granted in part. The court directs the AFBCMR to correct plaintiff's military records to reflect a disability discharge, based on a chronic back condition which is 40 percent disabling. The court denies defendant's motion for summary judgment and motion to dismiss. The parties are directed to calculate

---

**8.** *See Kirwin v. United States,* 23 Cl.Ct. 497, 507 (Cl.Ct.1991) (court acknowledged the weight to which VA ratings are entitled, but could not use

them because they were assigned long after plaintiff's discharge).

appropriate pay from the date of release from active duty, less amounts received from the VA, and to file a joint stipulation on or before September 6, 1991. Upon filing of the stipulation the Clerk is directed to enter judgment for plaintiff without further order of the court. Costs to plaintiff.